### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | **No. 19-CR-156 (CKK)** |
| : | |
| **DAVID PAITSEL,** : | |
| : | |
| **Defendant.** : | |

### UNITED STATES' OPPOSITION TO
### DEFENDANT PAITSEL'S MOTION FOR RELEASE PENDING APPEAL

Defendant David Paitsel took thousands of dollars in bribes from Codefendant Brian Bailey, who paid Defendant Paitsel to look up information in a law enforcement database. And, not just any information, but people's private personal identifiers. In other words, Defendant Paitsel sold his law enforcement badge to line his own pockets. For this egregious violation of the public trust, he was sentenced to a 24 months' imprisonment, below the advisory United States Sentencing Guidelines range for his offense. Now, he asks the Court to permit his release during the pendency of his appeal. Because the Defendant cannot meet his burden to show that his appeal raises a substantial question of law or fact likely to result in reversal, his motion should be denied.

### I.    Procedural Background

On May 14, 2018, a grand jury sitting in the District of Columbia returned a five-count Indictment, in which Defendant Paitsel was charged with conspiracy (Count Three), and Bribery (Count Five). Codefendant Bailey was charged with bribery and conspiracy for the same conduct, and related conduct in Counts One, Two, Three and Four.  On October 7, 2022, a jury convicted both defendants of all counts.   One year later, on October 18, 2023, the Court sentenced Defendant Paitsel to 24 months in prison for each of his two counts of conviction, to run concurrently. On

November 2, 2023, he filed a notice of appeal. He has been ordered to report to the Bureau of Prisons on January 16, 2024.

## II.    **Legal Standards Governing Defendant's Motion**

Federal law requires that a criminal defendant "who has been found guilty of an offense and sentenced to a term of imprisonment" be detained during the pendency of his appeal, unless the defendant can establish (A) by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released, and (B) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal." 18 U.S.C. § 3143(b)(1). Defendant's steadfast refusal to accept responsibility for his conduct, and utter disregard for the rule of law suggests he may continue to pose a danger to the community. Nevertheless, it is the latter factor—whether the Defendant's appeal raises a substantial question of law or fact likely to result in reversal—on which the Defendant's motion clearly fails.

In assessing the likelihood of success on appeal, the Defendant's conviction is presumed valid; the Defendant bears the burden of establishing otherwise. *See United States v. Perholtz*, 836 F.2d 554, 555-56 (D.C. Cir. 1988) ("The law has shifted from a presumption of release to a presumption of valid conviction."); *see also United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986) (finding that a defendant must "demonstrate that he has a substantial question to present [on appeal] before he may be admitted to bail"); *accord United States v. Libby*, 498 F. Supp. 2d 1, 4 (D.D.C. 2007). To overcome that presumption, a defendant must show that his or her appeal presents "a close question or one that very well could be decided the other way." *Perholtz*, 836 F.2d at 556. This "close question" standard is "more demanding" than one that requires the inquiry to be "fairly debatable," "fairly doubtful," or simply "not frivolous." *Id*. at 555.

### III.     Relevant Facts About the Defendant's Crimes

The District of Columbia's Tenant Opportunity to Purchase Act (TOPA) gives tenants an assignable right-of-first refusal to purchase their home if the landlord decides to sell it.  Trial Tr. 9/28/22 at 65-66 (Ladd Testimony). Before they can close on a sale, landlords must give their tenants written notice of a sale offer, afford the tenants a chance to match the offer, and file paperwork certifying as much with the Department of Housing and Community Development (DHCD), the government agency responsible for enforcing TOPA.  Trial Tr. 9/28/22 at 67-68 (Ladd Testimony). Once served with a sale offer, tenants have 15 days to exercise their "right-of-first-refusal"—to try and purchase the property.  This "right-of-first refusal" is commonly referred to as a tenant's "TOPA rights."  Tenants can assign their TOPA rights to someone else, including other tenants or a third-party, such as a property developer. *Id*. at 67. A property developer—or any other person—that acquires TOPA rights can competitively position itself to purchase a property, because no other buyer can finalize a deal without the TOPA-rights-holder getting the chance to beat it.  *Id*. That is precisely what Bailey wanted to do.

According to the evidence presented at trial, Bailey wanted to identify tenants with TOPA rights and acquire as many of those rights as necessary to emerge as the only person positioned to match a sale offer within the 15-day window.  If Bailey succeeded in being the only person to match the sale offer—to be the only person exercising a right-of-first refusal when all the other TOPA rights expired—he could then find investors to purchase the property and negotiate an "assignment fee"—basically a "finder's fee"—for himself.

Property developers seeking to acquire TOPA rights, like Bailey, would want nothing more than to get their hands on the sale offers filed with DHCD, and to do so as soon as possible within the 15-day expiration window.  But that is not how TOPA and DHCD work.  DHCD makes filed

sale offers available to the public, but without identifying the tenants on whom the sale offers have been served.  To prevent property developers from taking advantage of tenants, DHCD has a policy of keeping the identities of tenants with TOPA rights confidential from third parties, except in response to a request under the District's Freedom of Information Act (FOIA)—a process that usually takes up to 15 business days. Trial Tr. 9/28/22 at 68 (Ladd Testimony); Trial Tr. 9/28/22 at 128 (Pair Testimony).  Thus, for the most part, developers interested in acquiring TOPA rights must use their own means to identify tenants after learning that a property has been offered for sale.  A property developer capable of identifying tenants with TOPA rights at the same time sale offers are filed with DHCD would have a competitive advantage in the race to make money off the property sale.  Trial. Tr. 9/28/22 at 111 (Ladd Testimony).

For Bailey, that is where Dawne Dorsey came in.  Dawne Dorsey was a Program Specialist at DHCD.  Her responsibilities involved handling TOPA information, including the above-described sale notices that trigger TOPA rights.  9/28/22 Trial Tr. at 135 (Pair Testimony).  Dorsey had access to the tenant information Bailey wanted. But, Dorsey was specifically instructed not to give out the names of people who had TOPA rights as identified on the TOPA paperwork filed with DHCD. *See* Trial Tr. 9/28/22 at 136-137 (Pair Testimony).  She was also required to keep the TOPA paperwork confidential. *Id.*

Bailey met Dorsey in February 2016 and offered her approximately $500 per month to provide him with copies of landlord-filed sale offers from which he could identify tenants with TOPA rights.  Dorsey accepted.  On and off over the next two years, Dorsey took Bailey's money and, in return, disclosed sale offers containing tenant information, in violation of her lawful and official duty to DHCD.  Even with the competitive advantage afforded by putting Dorsey on his illicit payroll, the information Bailey paid for was not always sufficient to track down tenants and

4

buy their TOPA rights.  On occasion, Bailey needed more help.  That is where Defendant Paitsel came in.

The files Dorsey provided did not necessarily contain information helpful to contacting tenants and bargaining for their TOPA rights.  As Bailey told Paitsel: "The TOPA stuff is doing ok…obviously a lot depends on tracking people down.  Even when I get to them there's no guarantee but it only takes 1 or 2 to make it worth while."  Government's Trial Exhibit 104A (Apr. 22, 2017, email).  To help him track tenants down, Bailey turned to Paitsel, an FBI special agent with access to law enforcement tools designed to track people down.  One of those tools was an investigative database called CLEAR.

CLEAR is an online investigation software product that allows law enforcement agencies to conduct searches for, among other things, people's addresses, telephone numbers, email addresses, and other personal identifying information.  The software packages together law enforcement and other government and commercial databases from jurisdictions across the country so that they can be accessed through a single search engine, giving law enforcement personnel access to real-time and historical data about individuals, including criminal histories, vehicle registrations, cell phone information, and other personal data.

The jury heard testimony about the sensitivities associated with the use of CLEAR, a commercial database provided by Thompson-Reuters.  Trial Tr. 9/29/22 at 131-137 (Quinn Testimony) (discussing the nature of data stored in CLEAR).  The FBI has its own contract with Thompson-Reuters for the use of CLEAR. *Id*. at 132.  The database compiles vast amounts of personal information from public records and other commercial sources not readily available to the public: names, phone numbers, email addresses, home addresses, social security numbers, dates of birth, employment records, vehicle records, known associates and relatives, just to name

a few. *Id*. at 131-136. The database is so sensitive that FBI agents must state a permissible purpose before they are even able to run a search in the database. *Id.* at 137 (Q: Okay. I think you used the word "permissible" or "permissible reasons" a few minutes ago, and I think that you -- well, why are some of the reasons why there are permissible reasons for the use of CLEAR? A: Why are some of the reasons? Q: Or what. A: The sensitive nature of the data.). A federal statute called the Gramm-Leach-Bliley Act provides that misrepresenting the access purpose is a violation of the CLEAR subscriber agreement and other federal and state laws. *Id.* at 136-1367. And, if an FBI agent wants their CLEAR search to include motor vehicle records, another federal statute—the Driver's Privacy Protection Act of 1994—requires that the agent again state their purpose prior to running a search. *Id*. at 138.

The evidence showed that Defendant Paitsel looked up contact and other sensitive information of tenants holding TOPA rights in CLEAR and shared that information with Bailey. *See., e.g.,* Trial Tr. 9/30/22 at 39-40 (Waltz Testimony)(Q: What did David Paitsel do after Mr. Bailey sent him this TOPA notice? A: He performed queries in CLEAR."). Paitsel accessed the CLEAR database to do so at least thirty times. Government Trial Exhibit 104C. On each occasion when Paitsel accessed CLEAR, Paitsel lied about his purpose for using the database. Government Trial Exhibit 104C. In doing so, he did so in clear violation of his FBI duties.

At trial, Defendant Paitsel's FBI supervisor, Temitaya Aderoba testified that CLEAR was a law enforcement application used by FBI employees to locate people. Trial Tr. 9/29/22 at 93-94 (Aderoba Testimony). He explained that it was only to be used for official purposes, and that FBI agents were not permitted to use it for their own personal use, even on their own time. *Id.* at 94-95. He further testified that Defendant Paitsel, during the time under his supervision, had no official reason to use CLEAR. *Id*. at 97. Mr. Aderoba further explained that according to the FBI

ethics guidance, "[a]n FBI employee may not access any official FBI recordkeeping system to perform a criminal background or indices check to determine whether there is any derogatory information on a person who is dating her son. Such access constitutes a misuse of the nonpublic information contained in the database," and that this example was meant to guide FBI Employee conduct. Trial Tr. 9/29/22 at 120 (Aderoba Testimony).   He also discussed ways in which the aggregation of data can make it confidential.  *Id*. at 112.

The government also presented the jury with email messages in which Bailey promised he would pay Paitsel for the information Paitsel had given to Bailey.  In sum, evidence showed that Defendant Bailey paid Defendant Paisel over $10,000 in bribe payments (at least $4,100 in cash, and $6,500 by check). *See, e.g.* Government's Trial Exhibits 1N and 1O.

IV.     **Defendant's Forthcoming Appeal Lacks Merit**

    a.  **Even if Defendant's Appeal Were to Succeed, He Must Report to Prison for the Conspiracy Count**

The Defendant was convicted of both conspiracy (Count Three) and bribery (Count Five), and he was sentenced to a term of incarceration on both counts.  As discussed below, the challenges to Defendant's bribery conviction lack merit. Nevertheless, even were they to be successful, he must still report to the Bureau of Prisons to serve his time for the conspiracy count.  *See Pinkerton v. United States*, 328 U.S. 640, 643 (1946) ("It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.).

Defendant Paitsel's challenge to the bribery instruction in Count Five does not disturb the conspiracy conviction because the conspiracy for which he was convicted had multiple objects.  In Count Three, Defendant Paitsel was charged with conspiracy to commit bribery, with the objects of the conspiracy both a violation of 18 U.S.C. § 201(b)(2)(C) (Paitsel's receipt of bribes), and 18

U.S.C. § 201(b)(1)(C) (Bailey's payment of bribes). *See* ECF No. 18 (Indictment) at ¶ 50.  These are two separate and distinct offenses.  Indeed, "[t]he payment and the receipt of a bribe are not interdependent offenses… the donor's intent may differ completely from the donees." *United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974). Defendant Paitsel makes no attempt to challenge Defendant Bailey's bribery conviction, and his own participation in it.  Indeed, Defendant's motion previewing his forthcoming appeal does not attempt to disturb the conspiracy conviction beyond a cursory reference.  ECF No. 310 at 8.  When, as here, there is a multi-object conspiracy, a guilty verdict for conspiracy may stand, even where there is inadequate evidence to support one of multiple objects.  *See Griffin v. United States*, 502 U.S. 46 (1991) (a general guilty verdict in a multiple object conspiracy did not violate the Due Process Clause as long as the evidence was sufficient to support the guilt of the defendant on one of the objects).  For this reason alone, Defendant Paitsel's motion should be denied.

### b.  The Jury Instructions Did Not Direct a Guilty Verdict

Defendant's brief incorrectly suggests that the Court directed a verdict by instructing the jury that Defendant Paitsel's duty not to disclose confidential information was an official duty. Not so. Rather, the Court instructed the jury – consistent with the statute, Indictment and Government's theory of the case – that to find the Defendant guilty, they must find that the Government proved that he violated his official duty not to use government resources for nonofficial business.  In other words, the jury had to find both that he had an obligation not to use government resources for nonofficial business and that this obligation was his official duty.

#### i.  Relevant Legal Principles

This interpretation of the instruction is clear when understood in context, as the D.C. Circuit is required to do, even where an instruction may be erroneous. *See United States v. Martin*,

154 U.S. App. D.C. 359, 475 F.2d 943, 947 (D.C. Cir. 1973) ("[T]he numerous occasions on which we have examined alleged errors in jury instructions have resulted in the emergence of several propositions to assist us in our evaluation. Paramount among them is the principle that jury instructions are to be considered as a whole, rather than as isolated passages."). Indeed, the Supreme Court has stated that the court's task is "to view the charge itself as part of the whole trial." *United States v. Park*, 421 U.S. 658, 674 (1975); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). *See also United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005) (It is well-established that jury instructions "may not be judge in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.").

Further, in rejecting a defendant's challenge to a single sentence in a court's jury instructions, the D.C. Circuit has reiterated the Supreme Court's holding in *Estelle v. McGuire*. *See United States v. Purvis*, 706 F.3d 520, 523 (D.C. Cir. 2013). In doing so, the appellate court noted that in determining whether an instruction was erroneous, the court should look at the entire jury instruction and the arguments of counsel. *Id.*, citing *United States v. Chan Chin-Yin*, 958 F.2d 440, 444 (D.C. Cir. 1992). In reviewing instructions, the court considers "not just the challenged phrases, but the instructions as a whole." *United States v. Borda*, 786 F. Supp. 25, 41-42 (D.D.C. 2011). An allegedly erroneous instruction will not be grounds for a new trial where, considering all the circumstances, the language of the instructions, the arguments of counsel, and the evidence a trial, it is highly improbable that the jury convicted on an improper theory. *Id.* The court looks to see if the instructions give the jury a sufficient understanding of the issues and the applicable standards. *United States v. Washington*, 106 F.3d 983, 1002 (D.C. 1997); *United States v. Yunis*, 924 F.2d 1086, 1095-96 (D.C. Cir. 1991) (awkward word choice not sufficient to overturn a conviction).

**ii. Read in context, the Court's instruction was not erroneous.**

In Count Five, Defendant Paitsel was convicted of bribery under 18 U.S.C. § 201(b)(2)(C), which makes it a crime for a public official to, "directly or indirectly, corruptly demand, seek, receive, accept, or agree to receive or accept anything of value personally or for any other person or entity, in return being induced to do or omit to do any act in violation of the official duty of the public official." 18 U.S.C. § 201(b)(2)(C). Count Five was one of three bribery counts for the jury's consideration; the other involving Defendant Paitsel was Bailey's bribery of Defendant Paitsel, which was charged in Count Four as a violation of 18 U.S.C. § 201(b)(1)(C). These two subsections of § 201(b) appear to use the words "lawful" duty and "official" duty to refer to the subject of the bribe payor's inducement interchangeably, and the Court used both in its instructions.

The Court's instructions for Court Four, which immediately preceded those given for Count Five, stated that, "[f]or the purposes of this instruction, a lawful duty is any statutory, regulatory, or official duty imposed upon Mr. Paitsel either orally or in writing by virtue of and specific to his position as the supervisory special agent for the Federal Bureau of Investigation." That is, the Court placed that very question squarely on the jury's shoulders, charging that, to find guilt, the jury must find:

> Fourth, that Mr. Paitsel had a lawful duty not to use government resources for nonofficial business and/or to keep confidential the information for which Mr. Bailey allegedly gave, offered, or promised something of value to Mr. Paitsel.
>
> For the purposes of this instruction, a lawful duty is any statutory, regulatory, or official duty imposed upon Mr. Paitsel either orally or in writing by virtue of and specific to his position as the supervisory special agent for the Federal Bureau of Investigation.
>
> As for Count 4, the existence of a lawful duty may be proven through direct or circumstantial evidence. . . .

10/7/22 Tr. at 67.  The definition of this element was a matter of significant litigation, as the Government opposed defining the official duty via jury instructions, and Defendant Bailey, over the Government's objections, urged the Court to do so.

Because the Court gave that defense-requested instruction, it was clear to the jury that it was for *them* – not the Court – to decide whether the conduct identified as "duty not to use government resources for nonofficial business" rises the to the level of a lawful, or official duty because it was "imposed upon Mr. Paitsel either orally or in writing by virtue of and specific to his position as the supervisor special agent for the Federal Bureau of Investigation."  Indeed, moments later, the Court underscored that for the jury to decide whether or not Defendant Paitsel had such an official duty when it described one of his defense theories to them: "Mr. Paitsel's position is that the evidence at trial as discussed above shows that he did not violate his official duty or duties in providing the tenant information to Mr. Bailey." 10/7/22 Tr. at 74.  As that defense theory instruction made clear to the jury, it was a defense should they find he did not violate an "official duty."

Ultimately, when the Court instructed the jury on Count Five, that it combined the third and fourth elements into a single numbered point is of no moment.  The jury was well aware that it was for the jury to decide both whether Defendant Paitsel was "corruptly" induced as well as whether what he was "induced" to do was in violation of his "official duty not to use government resources for nonofficial business." 10/7/22 Tr. at 69.  Far from "removing an essential element from the jury's determination" as Defendant mistakenly argues (ECF No. 310 at 8), the Court's instruction did no more than consolidate the elements to be considered into a single sentence or phrase.  Doing so was no error.

### iii.  By failing to timely object, Defendant Paitsel waived any challenge to the instruction.

In addition, Defendant Paitsel has defaulted procedurally by failing to raise this issue timely at trial – nor even to so argue in the more than a year that since passed.[1]  That is, to the extent there was any ambiguity in the jury instructions, Defendant Paitsel did not object to it, despite opportunity to do so.  Indeed, this precise language to which he now objects was flagged by the Court for Defendant Paitsel's counsel before the jury was instructed, and he did not object to its phrasing despite repeated opportunities, including at a hearing on October 4, 2022[2] and despite having had ample time to review the instructions.[3]

---

[1] At trial, on October 5, 2022, Defendant Paitsel made a motion for judgment of acquittal (ECF No. 239); it was denied on the record – akin to a similar motion by Defendant Bailey. Post-verdict, Defendant Paitsel (and Defendant Bailey) were granted leave to file renewed Rule 29 motions. Despite extensions of time, Defendant Paitsel ultimately made no further substantive motion filing. On Feb. 21, 2023, the Court denied Defendant Paitsel's motion with a written opinion (ECF No. 265).  Neither in that written motion, nor any oral argument, nor (as described herein) in litigating the jury instructions during the trial, did Defendant Paitsel previously suggest any error in the instructions – a strong indication both that there was no error and that he saw no prejudice in how the instructions were drafted and delivered.

[2] *See* Trial Tr. 10/4/22 at 94:

> THE COURT: That Mr. Paitsel did so corruptly in return for being induced to violate his official duty not to use government resources for nonofficial business.
>
> MR. BENOWITZ: I would propose that we change the word "corruptly" to "with corrupt intent" to make it clearer, and also do the same thing three lines up from the bottom where it says corruptly."  It says the term "corruptly," and just change that to "corrupt intent."
>
> MS. ALOI: The statute says "corruptly." So we want to track the statutory language.
>
> THE COURT: That's the language that they used. I would be inclined not to change it. I will go back and look, but I have a question.  Anything else?
>
> MR. BENOWITZ: No, Your Honor.

[3] Defendants Paitsel and Bailey received ample opportunity to review and assess the proposed jury instructions – certainly by October 4 when they discussed them on the record, well before they

A party may not claim error with respect to a jury instruction if the party failed to object prior to the case going to the jury for deliberations or by failing to state specifically the grounds for the objection.  As Fed. R. Crim P. 30(d) provides, it was incumbent upon a defendant to raise any objection when the Court afforded him an opportunity to do so – before the jury was instructed. *See* Rule 30(d) ("Objections to Instructions. A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."). As the Advisory Committee notes for the 2002 Amendments emphasized, "Rule 30(d) clarifies what, if anything, counsel must do to preserve a claim of error regarding an instruction or failure to instruct. The rule retains the requirement of a contemporaneous and specific objection (before the jury retires to deliberate)."  *See Jones v. United States*, 527 U.S. 373 (1999); *Long v. Howard University*, 550

---

were delivered to the jury on October 7.  As the Court summarized before finalizing the instructions on October 6, 2022: "So this is where we are. For the matters that are at issue, everybody has had an opportunity to weigh in. On the jury instructions, you have had years to weigh in since, frankly, the original instructions were done back in – ready for trial in September 2021, a few days before, we continued it, December of 2021, the day of the trial. New people came in, so you had an opportunity to provide things over the summer and fall, and I have issued a whole series of different opinions. I have given you an opportunity to -- I gave it, I guess, the day before, Wednesday -- no, Tuesday, and you had an opportunity to review it. You have sent me responses back as late as 10:00 last night as well as this morning. So as far as I am concerned, we are done." 10/6/22 Tr. at 2.

Even thereafter, the Court accepted further objections and proposals from the parties at that hearing.  *Id*. at 6-8.

And then, just as the Court advised the parties it would do, it did not instruct the jury until the following day, October 7, giving the parties a further day to review the instructions.  Indeed, the Court admonished the parties to review them: "So you have the instructions that relate to the conspiracy and the bribery.  Please read them over carefully to make sure that you know what's in there." *Id*. at 26.

F.3d 21, 25 (D.C. Cir. 2008) (claim of error in jury instruction raised for first time in motion for new trial, and not objected to prior to case going to jury, is not timely); *United States v. Martin*, 475 F.2d 243 (D.C. Cir. 1973).  There are reasons for these rules; timely and specific objection are required so the trial court can meaningfully address any issue in the jury instructions.

Moreover, even were an appellate court to consider it, Defendant Paitsel's claim could not survive plain error review because – even assuming *arguendo* the Court had failed to instruct it on the official duty element – he cannot demonstrate prejudice.  In convicting Defendant Bailey on Count Four, the jury necessarily found that Bailey's bribee Paitsel had the requisite official duty. No less an authority than the Supreme Court has emphasized that the failure to instruct a jury on an element of the offense is not reversible error when it is not prejudicial. *See Neder v. United States*, 527 U.S. 1, 8-20 (1999).[4]

### c.  The Evidence was Sufficient to Sustain Defendant Paitsel's Bribery Conviction

In the latter half of his brief, Defendant Paitsel repackages his failed Rule 29 arguments, by claiming that his appeal is likely to be successful because the government failed to present evidence sufficient to meeting the elements of bribery, including showing that he had violated an official duty, and acted corruptly. ECF No. 310 at 8-14. As this Court already, and correctly held, these arguments fail.  *See* ECF No. 265 at 9 ("There was substantial evidence establishing the

---

[4] As the Seventh Circuit has noted, "forfeiture occurs where a defendant fails to object to a proposed jury instruction by 'stating distinctly the matter to which the [defendant] objects and the grounds of the objection.'" *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009), and forfeited objections are reviewed "only for plain error." *Id*.  "Further, plain-error review is particularly light-handed in the context of jury instructions, since it is unusual that any error in an instruction to which no party objected would be so great as to affect substantial rights."  *Id*. (quotation, citation omitted).  To the extent there was any error, the circumstances here are akin to those in *United States v. Mangieri*, where the D.C. Circuit found at most "plain error" review appropriate where appellant had an active role in developing the court's instruction.  *United States v. Mangieri*, 694 F.2d 1270, 1280 (D.C. Cir. 1982).

Paitsel understood that he was improperly accessing CLEAR in violation of a duty to use it only for FBI purposes in exchange for money payments.").

The evidence clearly showed that Defendant Paitsel acted corruptly.  As the Court explained to the jury, "[t]he term 'corruptly' means having an improper motive or purpose" which can be proven with evidence of "a hope or an expectation of either financial gain or other benefit to one's self[.]" *See* ECF No. 258-1 (Final Jury Instructions) at 36.  The evidence unambiguously showed that Defendant Paitsel misused the CLEAR database when he lied about his purpose for using the database on no less than 30 instances and did so for his own financial gain.  Government Exhibit 104C.  The emails and text messages between Paitsel and Bailey showed multiple instances in which Bailey promised to pay Paitsel for looking up tenant information.  Government Exhibits 106E, 106G, 3E (at 8).  And there was undisputed evidence that Bailey did, in fact, make check and cash payments to Paitsel of at least $7,500, directly linked to those promises to pay money.  Government Exhibits 1N, 1O.  As this Court correctly identified, the evidence showed that Codefendant Bailey did this, "[b]ecause Bailey knew that Paitsel had access to information that Bailey did not by virtue of Paitsel's position as an FBI agent."  ECF No. 265 at 3.  Indeed, the facts in this case show that Defendant Paitsel circumvented federal and state laws when he lied about his "permissible purpose" for accessing CLEAR.  Surely the jury could infer that Defendant Patisel, an FBI agent, had an official duty not to use CLEAR for his own personal gain - indeed, the CLEAR database reminded Paitsel every time he logged into it that he could only use CLEAR for purposes that complied with federal law.  Taken together, this is sufficient to establish the elements of bribery.

Defendant Paitsel suggests that he was convicted for accepting a reward for sharing contact information for tenants while completely sidestepping the fact that the evidence showed the

payments he received were to induce him to provide non-public information. Defendant Paitsel was not convicted for moonlighting.  He was not charged for failing to disclose outside employment.  Nor did he and Bailey have an employee/employer relationship. And, while the evidence showed he did misuse Government resources, that alone would have been insufficient to convict.  Official duties must be specific, as was the alleged duty here: not to use his CLEAR account to perform searches of tenants possessing TOPA rights, in other words, not to use government resources for nonofficial business. And the government presented more than ample evidence of the statutes and regulations creating that duty.

## V.    Conclusion

For years, Defendant Paitsel made a quick buck at the expense of the public trust. Defendant Paitsel enthusiastically joined Bailey's secret illicit payroll and, in exchange he sold Bailey information to which his official position afforded him unique access.  For this abhorrent conduct, Defendant Paitsel should not get special treatment, and should report to the Bureau of Prisons as ordered.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Elizabeth Aloi*
Elizabeth Aloi
John W. Borchert
D.C. Bar. 1015864 (Aloi)
D.C. Bar. 472821 (Borchert)
Assistant United States Attorneys
601 D Street, N.W.,
Washington, D.C. 20530
(202) 695-0610 (Aloi)
Elizabeth.Aloi@usdoj.gov
John.Borchert@usdoj.gov