**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2019**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No.** |
| **v.** | **Grand Jury Original** |
| **BRIAN BAILEY, and** | **VIOLATIONS:** |
| **DAVID PAITSEL,** | **Count 1: 18 U.S.C. § 371 (Conspiracy)**<br>**Count 2: 18 U.S.C. § 201(b)(1)(C) (Bribery)** |
| **Defendants.** | **Count 3: 18 U.S.C. § 371 (Conspiracy)**<br>**Count 4: 18 U.S.C. § 201(b)(1)(C) (Bribery)**<br>**Count 5: 18 U.S.C. § 201(b)(2)(C) (Bribery)** |
| | **Forfeiture Notice** |

## INDICTMENT

The Grand Jury charges that:

### General Allegations

At all times material to this indictment:

#### The Tenant Opportunity to Purchase Act

1.     The Tenant Opportunity to Purchase Act ("TOPA") provided tenants living in the District of Columbia with the right of first refusal to purchase their residence should the owner decide to sell the property.  Under TOPA, tenants could sell or assign their rights of first refusal to a third party.

2.     TOPA required the owner (seller) to provide each tenant a written copy of the Offer of Sale before selling the property or issuing a notice to vacate to the tenant.  The Offer of Sale contained the asking price and material terms of the sale and a statement that the tenant had the right to purchase the accommodation.  The owners also had to provide the District of Columbia Department of Housing and Community Development ("DHCD") with a copy of the Offer of Sale,

1

a copy of the ratified third party sale contract (if the owner already entered into one), a certification that the seller provided each tenant with a copy of the Offer of Sale, and a list of tenants (together, the "Offer of Sale Notice").

3.    DHCD had a policy that treated Offer of Sale Notices submitted by owners to DHCD as confidential because they contained the names of tenants. As such, DHCD directed its employees not to release or disseminate TOPA Offers of Sale Notices to un-related third parties to real estate transactions. DHCD informed its employees that an un-related third party to a real estate transaction could only obtain an Offer of Sale Notice by submitting a Freedom of Information Act ("FOIA") Request to DHCD. Moreover, when DHCD produced an Offer of Sale Notice in response to a FOIA request, DHCD redacted tenant names and contact information to protect those tenants' privacy interests.

The Relevant Parties

4.    Defendant BRIAN BAILEY ("BAILEY") was a resident of Upper Marlboro, Maryland. He worked as a realtor and property developer in the District of Columbia and surrounding area. BAILEY maintained a checking account at PNC Bank having the last four digits of 9635.

5.    PUBLIC OFFICIAL 1 was a District of Columbia employee who worked as a Program Specialist at DHCD. Her responsibilities included handling intake of TOPA filings submitted by property owners. As an employee of DHCD, PUBLIC OFFICIAL 1 had a lawful and official duty to maintain the confidentiality of information contained in TOPA Offer of Sale Notices by not releasing un-redacted Offer of Sale Notices to un-related third parties to real estate transactions.

2

6.      Defendant DAVID PAITSEL ("PAITSEL") was a Supervisory Special Agent for the Federal Bureau of Investigation ("FBI") in the District of Columbia.

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

### The Conspiracy

7.      The allegations contained in paragraphs 1 through 5 of this Indictment are re-alleged as if fully set forth herein.

8.      Between on or about February 23, 2016, and continuing thereafter until on or about August 20, 2018, in the District of Columbia and elsewhere, the defendant,

### BRIAN BAILEY,

together with PUBLIC OFFICIAL 1, did knowingly and unlawfully conspire, confederate, and agree with each other:

        a.      to directly and indirectly, corruptly give, offer, and promise anything of value to a public official to induce that public official to do and omit to do an act in violation of the lawful and official duty of that public official; that is, BAILEY gave, offered, and promised things of value to PUBLIC OFFICIAL 1, a DHCD Program Specialist, to induce PUBLIC OFFICIAL 1 to provide un-redacted TOPA Offer of Sale Notices to BAILEY in violation of PUBLIC OFFICIAL 1's lawful and official duty, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

        b.      to, being a public official, directly and indirectly, corruptly demand, seek, receive, accept and agree to receive and accept anything of value personally, in return for being induced to do and omit to do any act in violation of their lawful and official duty; that is, PUBLIC OFFICIAL 1, a DHCD Program Specialist, solicited and accepted things of value from BAILEY in return for providing un-redacted TOPA Offer of Sale Notices to BAILEY in violation of

3

PUBLIC OFFICIAL 1's lawful and official duty, in violation of Title 18, United States Code, Section 201(b)(2)(C).

## Purpose of the Conspiracy

9.      It was a purpose of the conspiracy for BAILEY to enrich himself by paying bribes to PUBLIC OFFICIAL 1 to obtain confidential information about District of Columbia tenants whose residences were pending sale so that he could attempt to purchase their TOPA rights before others had the chance to do so.

## Manner and Means

10.     The conspiracy was carried out through the following manner and means, among others:

a.      BAILEY obtained an introduction to PUBLIC OFFICIAL 1 through another public official that he knew at DHCD.

b.      BAILEY offered to pay PUBLIC OFFICIAL 1 money in return for PUBLIC OFFICIAL 1 using her position at DHCD to obtain and provide BAILEY with un-redacted TOPA Offer of Sale Notices, which are confidential and not available to un-related third parties to real estate transactions.

c.      PUBLIC OFFICIAL 1 accepted BAILEY's offer and used her position at DHCD to obtain the un-redacted TOPA Offer of Sale Notices that BAILEY wanted.

d.      PUBLIC OFFICIAL 1 transmitted the un-redacted TOPA Offer of Sale Notices to BAILEY even though BAILEY was not a party to those real estate transactions, in violation of PUBLIC OFFICIAL 1's lawful and official duty to DHCD to maintain the confidentiality of the information in the Offer of Sale Notices. PUBLIC OFFICIAL 1 transmitted

those un-redacted TOPA Offer of Sale Notices to BAILEY via email, using her official government email account and a personal email account.

        e.      BAILEY paid PUBLIC OFFICIAL 1 approximately $500 on a monthly basis by cash and check.

        f.      BAILEY used the confidential tenant information he bought from PUBLIC OFFICIAL 1 to locate the tenants and attempt to purchase their TOPA rights, as set forth in paragraphs 55 to 96 below.

        g.      To incentivize PUBLIC OFFICIAL 1, BAILEY suggested he might pay PUBLIC OFFICIAL 1 a bonus if he closed on a multi-unit dwelling for which he sought confidential tenant information from PUBLIC OFFICIAL 1.

        h.      BAILEY threatened to stop paying PUBLIC OFFICIAL 1 if PUBLIC OFFICIAL 1 did not provide the confidential tenant information on a timelier basis.

### Overt Acts

11.      In furtherance of the conspiracy, and to effect its objects and purposes, defendant BAILEY and PUBLIC OFFICIAL 1 committed the following overt acts, among others, in the District of Columbia and elsewhere:

#### BAILEY Enlists PUBLIC OFFICIAL 1

12.      In or around January or February 2016, BAILEY obtained an introduction to PUBLIC OFFICIAL 1 through another public official at DHCD.

13.      At their introduction, BAILEY offered to pay PUBLIC OFFICIAL 1 approximately $500 per month in exchange for PUBLIC OFFICIAL 1 using her position at DHCD to obtain and provide BAILEY with un-redacted TOPA Offer of Sale Notices, even though BAILEY was not a party to those real estate transactions, in violation of her lawful and official duty as a DHCD

employee to maintain the confidentiality of such information. PUBLIC OFFICIAL 1 agreed to provide the Offer of Sale Notices to Bailey.

BAILEY Obtains the Offer of Sale Notices

14.    On or about February 23, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 11 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

15.    On or about March 18, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 16 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

16.    On or about March 18, 2016, BAILEY sent an email to PUBLIC OFFICIAL 1, in which BAILEY wrote, "All of the documents came through BLANK and had no content…Please check and resend."

17.    On or about March 18, 2016, PUBLIC OFFICIAL 1 replied to the above email, stating, "I just tried sending it from my personal email. Let me know if it came through ok."

18.    On or about March 18, 2016, PUBLIC OFFICIAL 1 sent an email from her personal email account attaching approximately 16 .pdf files consisting of un-redacted TOPA Offer of Sale Notices. BAILEY later confirmed receiving the documents.

19.    On or about March 21, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 13 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

20.    On or about March 25, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY, in which PUBLIC OFFICIAL 1 wrote, "Good Morning, I have more that I will send today." Attached to that email were approximately 13 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

21.    On or about March 28, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 15 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

22.    On or about April 8, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 20 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

23.    On or about April 14, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY with the subject line, "TOPA." Attached to her email were approximately 14 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

24.    On or about May 9, 2016, BAILEY sent an email to PUBLIC OFFICIAL 1, in which BAILEY wrote, "If it's a multi unit and I get the rights and they close on it…I could give you 10,000 on something like that….I've got an investor that pressing me on this one. Even if it's not a multi-unit and I get the rights and they close…I'll give you 5,000…This is the best one so far."

25.    On or about May 26, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 7 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

26.    On or about June 13, 2016, BAILEY sent an email to PUBLIC OFFICIAL 1, in which BAILEY wrote:

> I want to sit and speak with you regarding our arrangement. You sending files isn't working out the way I thought it would. Initially I was getting files almost daily. Now I'm receiving files maybe 2 or 3 times a month.
>
> The files are time sensitive and most of the time I get them so late that I might only have a week or less to react. While I did finally flip 1910 5th Street on Friday, it really wasn't any money in it…by the time I pay Sidney who actually got the tenant rights, pay the tenants and pay you…I might make 3500 net.
>
> I'm paying you every month consistently with the exception of June because I've been in NJ…but you know that. This month alone I haven't received any emails form you at all…so if that's how it's going to play out…I'd rather not do it. It doesn't do me any good to receive the files with almost no time to react. We missed 2 real good opportunities to make some money but we didn't because u sent the files with days left on the acceptance period.

At any rate…I'll be home for 6 weeks after this week's minicamp which starts tomorrow. I'm in Miami but I'm coming home today for a few hours only to drive back to NJ tomorrow morning. I can meet with you this evening at my house to give you your cash but I really need to know what your plans are because I've been straight up with you and I feel like you're bullshitting.

27.    That same day, PUBLIC OFFICIAL 1 emailed BAILEY in response to the email

above, stating:

I understand what you're saying and I'm not bullshitting at all. I've been trying to send them as we got them but we were having issues processing Mail on time, especially with missing one of our employees. It left me with handling walkin clients then by the time I could scan it would be late. But we just got another employee so I could send them as soon as they come in. Right now I'm off today for my son graduation and will be at work on Tuesday and Wednesday. After that I will be off for a week to drop my kids off in Florida.

28.    Later that same day, PUBLIC OFFICIAL 1 sent another email to BAILEY, stating:

I was trying to respond while at the school but we can sit down and meet. Really we have been super busy beyond normal and one of the employees that was helping me with clients had been out so that left be with only seeing walk ins and my other work is being backed up. I didn't realize that the files j was sending were late so I do apologize. My intentions were never to bullshit because you're helping me out as well. So tomorrow when I get to work I will send files and let you know how much time left on them. Then going to forward I will be able to get in to work early so I can send them consistently without distraction. I will be gone for a week to take the kids to Florida but we can figure out a plan that will work for you.

29.    On or about August 1, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY

attaching approximately 15 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

30.    On or about October 27, 2016, PUBLIC OFFICIAL 1 sent an email to BAILEY

attaching approximately 16 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

8

31.    On or about April 25, 2017, BAILEY sent an email to PUBLIC OFFICIAL 1, in which BAILEY wrote, in relevant part, "Keep it coming!  Hopefully you'll be sending some fresh files today!  Thanks B."

32.    On or about May 3, 2017, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 12 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

33.    On or about May 11, 2017, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 7 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

34.    On or about June 21, 2017, BAILEY sent an email to PUBLIC OFFICIAL 1 with the subject line, "Notices."  In the body of his email, Bailey wrote, "Are u sending files today?"

35.    On or about June 26, 2017, BAILEY sent an email to PUBLIC OFFICIAL 1 with the subject line, "3021 15th Street NW."  In the body of his email, BAILEY wrote, "Please send me the complete file on 3021 15th Street NW...I need it ASAP!!!!!! We have a buyer who wants to review the contract. Thanks B."

36.    On or about September 28, 2017, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 5 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

37.    On or about December 18, 2017, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 10 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

38.    On or about January 23, 2018, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 6 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

39.    On or about April 3, 2018, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 6 .pdf files consisting of un-redacted TOPA Offer of Sale Notices.

40.    On or about July 2, 2018, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 3 .pdf files of un-redacted TOPA Offer of Sale Notices.  In the body of

her email, PUBLIC OFFICIAL 1 wrote, "Good morning, [t]his is the last of the items received for June."

    41.    On or about August 20, 2018, PUBLIC OFFICIAL 1 sent an email to BAILEY attaching approximately 2 .pdf files consisting of un-redacted TOPA Offer of Sale Notices. In the body of her email, PUBLIC OFFICIAL 1 wrote, "These are the only 2 so far. I think there are a few more that have to be processes."

BAILEY'S Bribes to PUBLIC OFFICIAL 1

    42.    Between on or about February 2016 through on or about April 2017, BAILEY made payments to PUBLIC OFFICIAL 1 in cash and checks, to include the following checks drawn on BAILEY's PNC Bank account, which PUBLIC OFFICIAL 1 endorsed:

| Para. # | Date of Check | Amount of Check |
|---|---|---|
| 42(a) | April 18, 2017 | $1,000 |
| 42(b) | May 3, 2017 | $500 |
| 42(c) | June 5, 2017 | $500 |
| 42(d) | July 6, 2017 | $500 |
| 42(e) | September 6, 2017 | $500 |
| 42(f) | October 6, 2017 | $500 |
| 42(g) | January 2, 2018 | $500 |
| 42(h) | January 31, 2018 | $500 |
| 42(i) | April 2, 2018 | $1,000 |
| 42(j) | May 4, 2018 | $500 |
| 42(k) | June 12, 2018 | $500 |
| 42(l) | July 9, 2018 | $500 |

| | | Total: | $7,000 |
|---|---|---|---|

(Conspiracy, in violation of Title 18, United States Code, Section 371.)

## COUNT TWO
### (Bribery – 18 U.S.C. § 201(b)(1)(C))

43.    The allegations set forth in paragraphs 1 through 5, and 11 through 42, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

44.    From on or about February 23, 2016, through on or about August 20, 2018, in the District of Columbia and elsewhere, the defendant,

### BRIAN BAILEY,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with intent to induce such public official to do and omit to do an act in violation of the public official's lawful and official duty; that is, BAILEY paid PUBLIC OFFICIAL 1, a DHCD Program Specialist, money to provide BAILEY with un-redacted TOPA Offer of Sale Notices, in violation of PUBLIC OFFICIAL 1's lawful and official duty to maintain the confidentiality of the information in the Offer of Sale Notices.

(Bribery, in violation of Title 18, United States Code, Section 201(b)(1)(C).)

## COUNT THREE
### (Conspiracy – 18 U.S.C. § 371)

45.    The allegations set forth in paragraphs 1 through 6 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### Background

46.    Thomson Reuters CLEAR ("CLEAR") was an online investigation software product that allowed law enforcement agencies to conduct searches for, among other things, people's addresses, telephone numbers, email addresses, and other personal identifying

11

information. FBI Special Agents, such as PAITSEL, had access to CLEAR and could only use

that software within the scope of their employment.

47.    CLEAR accounts required users to affirm that they were utilizing CLEAR for a

"Permissible Purpose" every time they logged into their CLEAR account. CLEAR stated the

following on its "Permissible Purpose" page:

> To maintain compliance with the privacy provisions of the federal
> Gramm-Leach-Bliley Act, and the subsequent regulations adopted
> by the Federal Trade Commission ("GLB"), a user must select only
> a single purpose from the presented list. Misrepresenting your
> access purpose is a violation of our subscriber agreement and certain
> federal and state laws. Any use of information maintained by West,
> a Thomson Reuters business, other than for the selected permissible
> purpose is grounds for account termination and may be referred to
> the appropriate governmental agency.

CLEAR then prompted the user to select one of nine Permissible Purposes from a drop down

menu. A CLEAR user must have selected one of those nine Permissible Purposes before they

could proceed to the next screen allowing the user to perform searches. Those nine Permissible

Purposes were:

a.    For use by a person holding a legal or beneficial interest relating to
the consumer.

b.    For use in complying with federal, state, or local laws, rules, and
other applicable legal requirements.

c.    For use as necessary to effect, administer or enforce a transaction
requested or authorized by the consumer.

d.    For use in complying with a properly authorized civil, criminal, or
regulatory investigation, or subpoena or summons by federal, state,
or local authorities.

e.    For use to protect against or prevent actual or potential fraud,
unauthorized transactions, claims or other liability.

f.    For use by a Law Enforcement Agency, self-regulatory
organizations or for an investigation on a matter related to public
safety.

g.      With the consent or at the direction of the consumer.

h.      To persons acting in a fiduciary or representative capacity on behalf of the consumer.

i.      For required institutional risk control or for resolving consumer disputes or inquires.

48.     As an FBI agent, PAITSEL owed the FBI and United States Department of Justice ("DOJ"), which oversees the FBI, various lawful and official duties. DOJ regulations governed the behavior of DOJ employees, including PAITSEL, and set forth those lawful and official duties. Among the lawful and official duties that PAITSEL owed the FBI and DOJ were the following:

a.      Federal regulations provided that DOJ employees, such as PAITSEL, could not use their position for their own private gain or for that of persons or organizations with which they were associated personally. 5 C.F.R. § 2635.702.

b.      Federal regulations further provided that DOJ employees, such as PAITSEL, could not use nonpublic information to further their private interests or those of another. *See* 5 C.F.R. § 2635.703(a). Nonpublic information is information an employee gains on the job that has not been made available to the general public and is not authorized to be made available upon request. 5 C.F.R. § 2635.703(b).

c.      Federal regulations provided that an employee should make an honest effort to use official time and government property only for official business. 5 C.F.R. § 2635.704(a).

d.      Federal regulations provided that an employee was required to endeavor to avoid any actions creating the appearance that the employee was violating the law or the ethical standards set forth in this part. 5 C.F.R. § 2635.101(b)(14).

49.     FBI policy further provided that Special Agents, such as PAITSEL, were generally prohibited from engaging in outside employment, except under limited circumstances and with

prior approval from the FBI.  PAITSEL never submitted to the FBI any requests to engage in outside employment.

### The Conspiracy

50.    Between on or about February 28, 2017, and continuing thereafter until on or about June 1, 2018, in the District of Columbia and elsewhere, the defendants,

**BRIAN BAILEY** and
**DAVID PAITSEL,**

did knowingly and unlawfully conspire, confederate, and agree together and with each other:

a.    to, directly and indirectly, corruptly give, offer and promise anything of value to a public official to induce that public official to do and omit to do an act in violation of the lawful and official duty of that public official; that is, BAILEY gave, offered, and promised things of value to PAITSEL, an FBI Supervisory Special Agent, to induce PAITSEL to provide BAILEY with non-public information that PAITSEL obtained using FBI resources, in violation of PAITSEL's lawful and official duties, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

b.    to, being a public official, directly and indirectly, corruptly demand, seek, receive, accept and agree to receive and accept anything of value personally, in return for being induced to do and omit to do any act in violation of their lawful and official duty; that is, PAITSEL, an FBI Supervisory Special Agent, solicited and accepted things of value from BAILEY to provide BAILEY with non-public information that PAITSEL obtained using FBI resources, in violation of PAITSEL's lawful and official duties, in violation of Title 18, United States Code, Section 201(b)(2)(C).

14

## Purpose of the Conspiracy

51.     It was a purpose of the conspiracy for BAILEY to enrich himself by paying bribes to PAITSEL to obtain personal contact information of District of Columbia tenants whose residences were pending sale so that he could contact them to attempt to purchase their TOPA rights before others had the chance to do so.

52.     It was also a purpose of the conspiracy for PAITSEL to enrich himself by accepting bribes from BAILEY in exchange for using his position as an FBI Supervisory Special Agent to obtain and supply BAILEY with the tenant information BAILEY sought, in violation of PAITSEL'S lawful and official duty to the FBI and DOJ.

## Manner and Means

53.     The conspiracy was carried out through the following manner and means, among others:

a.     BAILEY offered to pay PAITSEL money in return for PAITSEL using his Supervisory Special Agent position at the FBI to obtain and provide BAILEY with personal contact information, including telephone numbers and email addresses, of District of Columbia tenants who had received Offer of Sale Notices under TOPA, which PAITSEL accepted.

b.     BAILEY transmitted to PAITSEL's personal email account the names of District of Columbia tenants listed in Offer of Sale Notices, which BAILEY obtained as described in paragraphs 7 through 42 above, including, in some instances, sending PAITSEL the un-redacted Offer of Sale Notice itself.

c.     PAITSEL used the access to CLEAR available to him as an FBI Supervisory Special Agent, falsely affirming that he was doing so for a "Permissible Purpose," to

search the tenant names provided by BAILEY and obtain the personal contact information BAILEY wanted, in violation of PAITSEL'S lawful and official duties to the FBI and DOJ.

      d.     PAITSEL cut and pasted the tenants' personal contact information from CLEAR into an email and transmitted it from his personal email account to BAILEY, in violation of his lawful and official duties to the FBI and DOJ.

      e.     BAILEY used the personal contact information supplied by PAITSEL to contact the tenants and attempt to purchase the tenants' TOPA rights.

      f.     BAILEY paid PAITSEL for the information PAITSEL provided when BAILEY was successful in negotiating a purchase of the TOPA rights and profiting from subsequently selling or reassigning those rights.

      g.     PAITSEL hid from the FBI the work he performed for BAILEY and the payments he accepted in exchange, including neglecting to seek authorization to perform outside work and omitting the payments from his annual financial disclosure form.

### Overt Acts

54.     In furtherance of the conspiracy, and to effect its objects and purposes, defendants BAILEY and PAITSEL committed the following overt acts, among others, in the District of Columbia and elsewhere:

### 224 T Street NE

55.     On or about May 11, 2017, BAILEY obtained from PUBLIC OFFICIAL 1 an un-redacted Offer of Sale Notice for 224 T Street NE, Washington, D.C. The Offer of Sale Notice listed tenants for that property, one of which had the initials, "P.B."

56.     On or about May 11, 2017, BAILEY sent an email to PAITSEL's personal email account containing the Offer of Sale Notice for 224 T Street NE. BAILEY wrote, in relevant part,

"David I need your help on this one. If I can get just one of the tenants to sign it would be awesome. The file is attached….The address is 224 T Street NE WDC 20002." BAILEY listed the names of four tenants, including "P.B."

57.    On or about May 11, 2017, from approximately 8:33 PM to 8:53 PM, PAITSEL utilized his FBI-issued CLEAR account to conduct approximately forty-nine searches. At approximately 8:54 PM, PAITSEL sent an email to BAILEY containing personal contact information for the same four individuals that BAILEY listed in his email, including "P.B." That contact information was copied and pasted from CLEAR.

58.    Less than one hour later, BAILEY called the telephone number that PAITSEL provided for "P.B." and carried on a conversation that lasted approximately nine minutes.

59.    The next day, on or about May 12, 2017, BAILEY called the telephone number that PAITSEL provided for "P.B." again.

60.    Later that same day, BAILEY gave "P.B." an "Assignment of Interest and Right of 1st Refusal Agreement," which P.B. executed, and thereby agreed to sell his right of first refusal under TOPA to purchase 224 T Street NE to BAILEY for $500 cash.

61.    After BAILEY got in touch with "P.B.", still on or about May 12, 2017, BAILEY sent an email to PAITSEL, stating, "Dave…. I got in touch with ["P.B."]. If I get paid off of it I'm going to give you 5k."

62.    On or about October 4, 2017, BAILEY sent an email to PAITSEL, stating, in relevant part, "David...I will have the money tomorrow from the smaller deal. Do you want to meet this weekend so I can get it to you?" PAITSEL responded the same day, "Let's plan on 1130 or 12 for Saturday."

63.     On or about October 6, 2017, BAILEY received a wire transfer of $40,000 into his PNC Bank account from Monarch Title.  A notation for the wire transfer in BAILEY's bank records indicated the wire was for an "ASSIGNMENT FEE."

64.     The next day, on or about Saturday, October 7, 2017, at approximately 9:58 AM, PAITSEL sent a text message to BAILEY, stating, "Are you still good for lunch today?"  Within three minutes, BAILEY responded, "meet me at my house around 12noon."

65.     The same day that BAILEY and PAITSEL agreed to meet, on or about Saturday, October 7, 2017, BAILEY withdrew $4,100 in cash from his bank account.

3021 15th Street NW

66.     On or about May 3, 2017, BAILEY obtained an Offer of Sale Notice for 3021 15th Street NW, Washington, DC, from PUBLIC OFFICIAL 1.  One of the tenants listed in that Offer of Sale Notice had the initials, "T.M."

67.     On or about May 11, 2017, BAILEY emailed PAITSEL, stating, in relevant part, "I'm doing pretty good on the Topa stuff!  See if you can get a number on this guy…. ["T.M."] 3021 15th Street NW Washington DC 20009."

68.     On or about May 11, 2017, from approximately 8:33 PM to 8:53 PM, PAITSEL utilized his FBI-issued CLEAR account to conduct approximately forty-nine searches.  At approximately 8:54 PM, PAITSEL sent an email to BAILEY containing personal contact information for "T.M." that was copied and pasted from CLEAR.

69.     On or about May 12, 2017, BAILEY sent an email to PAITSEL that read, in relevant part, "Do you have any other info for ["T.M."] 3021 15th Street NW WDC 20009[.]  The number was disconnected…email address anything.  Would be good."

18

70.    Later that same day, on or about May 12, 2017, from approximately 11:21 PM to 11:24 PM, PAITSEL utilized his FBI-issued CLEAR account to conduct approximately fourteen queries. At approximately 11:26 PM, PAITSEL sent an email to BAILEY containing additional contact information for "T.M."  That information was copied and pasted from CLEAR and included "T.M.'s" name, multiple addresses, and a new phone number.

71.    The next day, on or about May 13, 2017, BAILEY called the telephone number that PAITSEL provided for "T.M."

72.    On or about June 5, 2017, BAILEY entered into an "Assignment of Interest and Right of 1st Refusal Agreement," whereby "T.M." agreed to sell his first of right of first refusal to purchase 3021 15th Street NW to BAILEY for $10,000.

73.    On or about June 17, 2017, BAILEY emailed PAITSEL, stating, in relevant part, "Hey Bro… I owe you 5k!!! I found ["T.M."] of 3021 15th Street NW. He assigned his rights over to me. I'm going to flip the contract to another investor who has already escrowed the money to purchase the property."

74.    On or about September 29, 2017, at approximately 2:51 PM, BAILEY sent a text message to PAITSEL that read, "September 29th for closing on 3021 15th Street Bro! I'll give u that 5k. Keep your fingers crossed. You know how those closings go. Hope all is well Bro! Thanks B!"

75.    On or about December 1, 2017, BAILEY sent an email to PAITSEL that read, in relevant part, "Looks like we will get our money for 3021 15th Street NW between December 7th and the 12th. I owe you 5k on that."

76.    On or about January 11, 2018, BAILEY collected the proceeds from his sale of the purchase rights to 3021 15th Street, totaling $251,465.

77.    The next day, on or about January 12, 2018 at approximately 1:52 PM, BAILEY sent a text message to PAITSEL that read, "Call me...no rush."

78.    That same day, on or about January 12, 2018, BAILEY wrote a check to PAITSEL for $6,500, which PAITSEL endorsed.

### 1407 10th Street NW

79.    On or about September 28, 2017, BAILEY obtained an Offer of Sale Notice for 1407 10th Street NW from PUBLIC OFFICIAL 1. One of the tenants listed in the Offer of Sale Notice had the initials, "M.M."

80.    On or about October 2, 2017, BAILEY sent an email to PAITSEL that contained the Offer of Sale Notice for 1407 10th Street NW. In the body of that email, BAILEY wrote, "Sup Bro! Take a look at this tenant list...See if you can get numbers them please."

81.    The day after receiving BAILEY'S email, on or about October 3, 2017, from approximately 11:15 AM to 11:49 AM, PAITSEL utilized his FBI-issued CLEAR account to conduct approximately forty-nine searches. At approximately 11:44 AM, PAITSEL sent an email to BAILEY containing contact information for "M.M." that was copied and pasted from CLEAR and included "M.M's" name and two phone numbers.

82.    On or about October 12, 2017, BAILEY called the telephone number that PAITSEL provided for "M.M." and carried on a conversation that lasted approximately five minutes.

83.    On or about October 18, 2017, BAILEY called the telephone number that PAITSEL provided for "M.M." and carried on another conversation lasting approximately seven minutes.

84.    The next day, on or about October 19, 2017, BAILEY entered into an agreement with "M.M." titled, "Assignment of Interest and Right of 1st Refusal Agreement," whereby

"M.M." agreed to sell her right of first refusal to purchase 1407 10th Street NW to BAILEY for $35,000.

85.    On or about December 1, 2017, BALEY emailed PAITSEL, stating, in relevant part, "1407 10th Street hopefully will close by the beginning of the year. That one will give you 1500-2500."

86.    On or about January 2, 2018, BAILEY collected the payment for 1407 10th Street NW by receiving a $50,000 wire transfer into his PNC Bank account.

87.    On or about January 12, 2018, at approximately 1:52 PM, BAILEY sent a text message to PAITSEL that read, "Call me…no rush."

88.    The very same day, BAILEY wrote a check to PAITSEL for $6,500, $1,500 of which constituted PAITSEL's payment for the personal confidential information he provided about tenants living in 1407 10th Street NW. PAITSEL endorsed the check.

3968 Martin Luther King Jr. Ave SW

89.    On or about May 18, 2018, BAILEY obtained an Offer of Sale Notice for 3968 Martin Luther King Jr. Ave SW from PUBLIC OFFICIAL 1. One of the tenants listed in the Offer of Sale Notice had the initials, "S.C."

90.    On or about May 19, 2018, BAILEY sent an email to PAITSEL that contained the Offer of Sale Notice for 3968 Martin Luther King Jr Ave SW. BAILEY wrote, in relevant part, "Hope u can track these tenants down. When do u have time? We need to do lunch."

91.    On or about May 20, 2018, from approximately 11:13 AM to 11:29 AM, PAITSEL utilized his FBI-issued CLEAR account to conduct approximately eight searches.

92.    At approximately 11:19 AM, PAITSEL emailed BAILEY, stating, in relevant part, "[S.C.] didn't have a number listed but this person has the same last name and lived in the same

apartment." PAITSEL copied and pasted from CLEAR the personal contact information for the second person, including their email address, into his email to BAILEY.

93.    At approximately 11:21 AM, PAITSEL emailed BAILEY the contact information for "S.C.," which was copied and pasted from CLEAR and included "S.C.'s" name, date of birth, addresses, and numerous phone numbers.

94.    On or about May 20, 2018, BAILEY sent an email to an email addresses provided by PAITSEL for the second person referenced above. BAILEY wrote, in relevant part, "I'm trying to get in touch with you or [S.C.] regarding the sale of a building you use to live in. 3968 MLK Jr. AVE SE is for sale … I would be interested in paying you and [S.C.] for your TOPA Rights. Please give me a call when you get a moment."

95.    On or about May 24, 2018, BAILEY entered into an agreement with "S.C." titled, "ASSISGNMENT OF INTEREST AND RIGHTS AGREEMENT," whereby "S.C." agreed to sell her right of first refusal to purchase 3968 Martin Luther King Jr. Ave SW to BAILEY for $2,500.

96.    Three days later, on or about May 27, 2018, BAILEY sent a text message to PAITSEL that read, "I tracked one of the tenants down for 3968 MLK Jr. Ave SW. She signed so we should have some money coming out way. I have a buyer for the property. Just patiently waiting for the timeline to expire."

(Conspiracy, in violation of Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Bribery – 18 U.S.C. § 201(b)(1)(C))

97.    The allegations set forth in paragraphs 1 through 6, and 54 through 96, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

98.    From on or about February 28, 2017, through on or about June 1, 2018, in the District of Columbia and elsewhere, the defendant,

22

**BRIAN BAILEY**,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with intent to induce such public official to do and omit to do an act in violation of the public official's lawful and official duty; that is, BAILEY paid PAITSEL, an FBI Supervisory Special Agent, money for PAITSEL to use his FBI-issued CLEAR account to search for and provide BAILEY with the personal contact information of District of Columbia tenants who had been provided with a Notice of Offer of Sale under TOPA, in violation of his lawful and official duties to the FBI and DOJ.

(Bribery, in violation of Title 18, United States Code, Section 201(b)(1)(C))

## COUNT FIVE
## (Bribery – 18 U.S.C. § 201(b)(2)(C))

99.    The allegations set forth in paragraphs 1 through 6, and 54 through 96, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

100.    From on or about February 28, 2017, through on or about June 1, 2018, in the District of Columbia and elsewhere, the defendant,

**DAVID PAITSEL,**

being a public official, did, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another person, in return for being induced to do and omit to do any act in violation of his lawful and official duty; that is, PAITSEL, an FBI Supervisory Special Agent, received money from BAILEY to use his FBI-issued CLEAR account to perform searches of tenants possessing TOPA rights in violation of his lawful and official duties.

(Bribery, in violation of Title 18, United States Code, Section 201(b)(2)(C))

23

## CRIMINAL FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in Count One through Count Five of this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18< united States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party'

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).**

A TRUE BILL

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA